UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ERIC REIBER, et al., | NO: 11-CV-0129-TOR |
| Plaintiffs, | |
| v. | ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| CITY OF PULLMAN, et al., | |
| Defendants. | |

BEFORE THE COURT is Defendants' Motion for Partial Summary Judgment (ECF No. 34). This matter was heard with oral argument on January 10, 2013. Patricia B. Urquhart appeared on behalf of the Plaintiffs. Michael C. Bolasina appeared on behalf of the Defendants. The Court has reviewed the briefing and the record and files herein, and is fully informed.

BACKGROUND

Captain Eric Reiber of the Pullman Fire Department, along with six of his current and former co-workers, have sued the City of Pullman, two city administrators, and the former Chief of the Department for various causes of action

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 1

arising from two distinct investigations of alleged workplace misconduct. Defendants seek partial summary judgment on several claims arising under the federal Constitution and Washington common law.  For the reasons discussed herein, Defendants are entitled to summary judgment on the challenged claims.

Three claims contained in the Amended Complaint, ECF No. 2 and 2-1, have not been challenged here: retaliation under Title VII, retaliation under the Washington Law Against Discrimination, and civil conspiracy.  However, the Court notes that conspiracy is not a cause of action, but rather a theory of liability to hold others responsible for a wrongful act.  *See W.G. Platts, Inc. v. Platts,* 73 Wash.2d 434, 439 (1968) (civil conspiracy is not, by itself, an actionable claim; plaintiff must be able to show an underlying actionable claim which was accomplished by the conspiracy for the civil claim of conspiracy to be valid).

FACTS

Plaintiff Eric Reiber ("Reiber") was, at all times relevant to this lawsuit, a Captain in the Pullman Fire Department.  On April 27, 2009, firefighter C.T.[1] complained to one of her colleagues, firefighter A.H., about how she was being treated by Reiber while on the job.  A.H. relayed the complaint to his supervisor,

---

[1] The Court will refer to certain non-parties to this litigation by their initials in order to protect their privacy from unproven allegations.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 2

J.T., who in turn relayed the complaint to the Chief of the department, Defendant Patrick Wilkins ("Chief Wilkins"[2]).

Chief Wilkins met with J.T. on April 28, 2009, to discuss the nature of C.T.'s complaint.  During this meeting, J.T. explained that C.T. had complained about Reiber touching her on the back or shoulder, playing with her ponytail, and accosting her for not doing as many chores as the other firefighters on her shift. J.T. further explained that, as a result of these incidents, C.T. did not feel comfortable around Reiber and did not feel that he could supervise or evaluate her fairly.

J.T. also advised Chief Wilkins during this meeting that he had received two other recent complaints against Reiber.  According to J.T., firefighter A.H. had complained about Reiber directing excessive anger toward Reiber's subordinates and accusing A.H. of having an inappropriate relationship with C.T.  J.T. further stated that a different firefighter, E.T., had mentioned Reiber asking for nude photographs of E.T.'s wife and making comments of an inappropriate sexual nature to E.T.'s wife over the telephone.

---

[2] Defendant Patrick Wilkins will be referred to as "Chief Wilkins" in an effort to distinguish him from Plaintiff Jason Wilkins.  Defendant Patrick Wilkins and Plaintiff Jason Wilkins are not related.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 3

At Chief Wilkins' request, J.T. memorialized the complaints against Reiber in a written memorandum dated April 28, 2009.  ECF No. 87-1.  Chief Wilkins also met with and obtained written statements from C.T., A.H. and E.T.  ECF Nos. 38-1, 38-3, 38-4.  Chief Wilkins subsequently forwarded these documents to the City of Pullman's Human Resources Manager, Defendant Karen Sires ("Sires"), and requested that she open an investigation into whether Reiber had created a hostile work environment.  Reiber was placed on paid administrative leave pending the results of the investigation on May 5, 2009.  ECF No. 38 at ¶ 10.

Upon opening her investigation, Sires formulated a list of uniform interview questions.  Although many of these questions focused on conduct specific to Reiber, they were generally open-ended and did not reference any specific allegations.  For example:

- Have you ever witnessed Captain Eric Reiber interacting with a Pullman Fire Department member in a manner that made you or others uncomfortable?  Describe.

- Have you ever witnessed other members of the Pullman Fire Department being asked by Captain Eric Reiber to perform tasks or duties that appeared inappropriate?  What were those tasks or duties?

- Have you ever witnessed Captain Eric Reiber making disparaging or derogatory remarks regarding other members of the Pullman Fire Department?  Describe.

- Have you or anyone you know ever indicated that they felt uncomfortable around or intimidated by Captain Eric Reiber?  If yes, describe.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 4

- Have you ever felt pressured by Captain Eric Reiber or any other firefighters to participate in activities you were not comfortable with?

- Have you or anyone you know been the subject of sexually suggestive comments made by Captain Eric Reiber?

- Have you or anyone you know ever been requested to provide Captain Eric Reiber with sexually explicit photos?

ECF No. 38-8. During the course of her investigation, Sires interviewed approximately 22 employees. Each employee's responses to the interview questions were recorded on a standard written form.

Sires interviewed Reiber on May 22, 2009. Reiber was represented during this meeting by the vice president of his labor union as well as a union attorney. During this interview, Reiber provided Sires with a written rebuttal to C.T.'s hostile work environment complaint. ECF No. 38-5. In rebutting C.T.'s allegations, Reiber stated that he had never deliberately engaged in any inappropriate conduct toward C.T. He did, however, admit to having occasionally tugged on C.T.'s ponytail, which he characterized as a friendly sign of affection between close personal friends. ECF No. 38-5 at ¶ 8.

After interviewing Reiber, Sires drafted a formal investigation report. ECF No. 38-6. In this report, Sires provided a detailed summary of the information she had gathered during her interviews, including relevant statements made by specific employees. She also made several findings of fact, including a finding that

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 5

Reiber's conduct "does appear [to be] consistently and pervasively inappropriate." ECF No. 38-6 at 54.  Though not styled as a finding of fact, Sires also noted that "[t]here are two separate claims that Captain Reiber requested sexually explicit photos of other firefighters' wives.  One time the request was made of a firefighter, asking that he provide photos of his wife[,] and the other was a direct request made to a wife of a fire lieutenant."  ECF No. 38-6 at 55-56.  In concluding, Sires wrote:

> Firefighter C.T. is the only female in the department[,] and Captain Reiber's consistently demeaning comments regarding women[,] as well as the manner in which he chooses to address problems, [through] demonstration[s] of power and humiliation, have resulted in a work environment that is unmanageable for at least one employee.

ECF No. 38-6 at 59.

On June 8, 2009, Chief Wilkins sent a pre-disciplinary notice to Reiber. ECF No. 38-7.  In this notice, Chief Wilkins informed Reiber that he had reviewed Sires' report, had concluded that Reiber had violated department policy, and was considering permanently demoting Reiber to the rank of firefighter.  ECF No. 38 at ¶ 17.  He also provided Reiber with copies of Sires' investigation report and, later, with Sires' interview notes.  Finally, Chief Wilkins informed Reiber that a pre-disciplinary hearing had been scheduled for June 24, 2009, at which time Reiber would be permitted to "present . . . any new or additional information, and clear [his] name," before a final disciplinary decision was made.  ECF No. 38-7 at 64.

1    The pre-disciplinary hearing proceeded as scheduled on June 24, 2009.  As

2    during the prior meeting with Chief Wilkins, Reiber was represented by the vice

3    president of his labor union as well as a union attorney.  Reiber testified on his own

4    behalf and presented argument through his attorney.  He also attempted to present

5    live testimony from six other witnesses, but was not permitted to do so.  Reiber

6    was, however, permitted to submit written statements from these witnesses on a

7    later date.

8        At some point after the pre-disciplinary hearing, and while the matter was

9    still pending, Plaintiff Rudy Fisher ("Fisher") began contacting employees who

10   had been interviewed by Sires during the investigation.  Concerned that Fisher was

11   attempting to "dig up dirt on the employees who [had] complained about Reiber,"

12   Sires sent Fisher a letter dated June 26, 2009, in which she advised him that his

13   conduct could be construed as unlawful retaliation.  ECF No. 38 at ¶ 28.  Sires

14   specifically informed Fisher of various departmental policies and state laws

15   protecting employees who either initiate or participate in misconduct

16   investigations.  She further cautioned him against "engaging in Watergate-era

17   tactics of digging up undesirable personal information about one's perceived

18   detractors."  ECF No. 38-9 at 88-89.  Finally, Sires advised Fisher that she did not

19   presently intend to initiate a retaliation investigation against him "or any other

20   colleague who has engaged in similar 'investigation[s].'"  She did, however, warn

Fisher that his conduct "[was] either at the line or over it, and [that] additional conduct along these lines will be subject to its own investigation and potential discipline." ECF No. 38-9 at 89.

On July 3, 2009, Reiber submitted a package of documents to Sires relating to the pending disciplinary proceedings. Included among these documents was a lengthy rebuttal to Sires' investigation report as well as written statements from Plaintiffs Fisher, Chris Volk, Jason Wilkins, Blake Richards, Chris Wehrung, and John Gollnick. ECF No. 38-10. Fisher signed his statement in his capacity as the Vice President of the firefighters' labor union, while the remaining Plaintiffs simply signed their own names.

On July 10, 2009, Chief Wilkins sent a letter to Reiber informing him of the outcome of the investigation. In this letter, Chief Wilkins provided history of the investigation into Reiber's conduct, made specific findings of fact, and gave detailed reasons supporting his decision to impose discipline. ECF No. 38-12. Chief Wilkins informed Reiber that, as a result of his finding that Reiber had created a hostile work environment, Reiber would be suspended without pay for one month and temporarily demoted to the rank of firefighter for a period of six months. ECF No. 38-12. Finally, Chief Wilkins directed Reiber to contact him in the event that Reiber wished to pursue a post-disciplinary opportunity to clear his name. ECF No. 38-12.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 8

At some point after Reiber was formally disciplined, Sires initiated an investigation into the conduct of C.T., J.T., A.H. and E.T. at the direction of the City of Pullman's City Supervisor, Defendant John Sherman ("Sherman"). This investigation was based solely upon allegations made against these employees by Plaintiffs Fisher, Volk, Wilkins, Richards, Wehrung and Gollnick during the Reiber investigation. ECF No. 38 at ¶ 39. Sires ultimately concluded that the allegations against C.T., J.T. and E.T. were unfounded, but found that A.H. had made inappropriate statements of a sexual nature while on duty. ECF No. 38 at ¶ 40. These conclusions were memorialized in an investigation report which Sires submitted to Chief Wilkins. ECF No. 38-13. A.H. was subsequently issued a written reprimand. ECF No. 38-14.

On October 20, 2009, A.H. lodged a formal complaint against Plaintiffs Reiber, Fisher, Volk, Wilkins, Richards, Wehrung and Gollnick, alleging that they had made false accusations against him in their July 3, 2009 written submissions to Chief Wilkins. ECF No. 38-15. J.T. filed a similar retaliation complaint on November 13, 2009. ECF No. 38-16. Apparently recognizing that the situation had begun to spiral out of control, the City of Pullman retained an outside attorney, Beth Kennar, to investigate whether Plaintiffs had unlawfully retaliated against A.H. and J.T. ECF No. 38 at ¶ 44.

After performing an exhaustive investigation, Ms. Kennar concluded that Fisher, Volk, Wilkins, Richards, Wehrung and Gollnick had each engaged in unlawful retaliation during the Reiber investigation.  ECF No. 38-17 at 200-264.  As to Reiber, however, Ms. Kennar found that no retaliation had occurred.  ECF No. 38-17 at 265-274.  Upon receiving Ms. Kennar's investigative findings, Chief Wilkins informed Fisher, Volk, Wilkins, Richards, Wehrung and Gollnick of his intent to impose discipline and scheduled a pre-disciplinary hearing.  Following the hearing, Chief Wilkins demoted Fisher from the rank of lieutenant to firefighter and suspended him without pay for 30 days.  ECF No. 38 at ¶ 53.  Volk, Wilkins, Richards, Wehrung and Gollnick received suspensions of either three or six days.  ECF No. 38 at ¶ 53.

Each of the Plaintiffs grieved their respective disciplinary sanctions to Defendant Sherman in late 2009.  For reasons not directly relevant to the instant motion, Sherman upheld the discipline imposed against Reiber, reversed the sanctions imposed against Fisher, Volk, Wehrung and Gollnick, and reduced the suspensions of Wilkins and Richards to one day.  Sherman Decl., ECF No. 37, at ¶¶ 10, 16-17.  Reiber, Wilkins and Richards subsequently grieved Sherman's decisions to arbitration pursuant to the terms of their collective bargaining agreement.  Reiber's arbitration resulted in his discipline being reduced; the record does not reveal what became of Wilkins' and Richards' arbitrations.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 10

On December 16, 2009, Plaintiffs' labor union filed an unfair labor practice complaint with the Washington Public Employment Relations Commission ("PERC"). The basis for this complaint was that the City of Pullman's investigation and discipline of Reiber for creating a hostile work environment, as well as its investigation and discipline of the remaining Plaintiffs for retaliating against Reiber's accusers, constituted unlawful retaliation against protected labor union activity. The relevant issues before the PERC hearing examiner were as follows:

1. Did the employer discriminate against Eric Reiber in violation of RCW 41.56.140(1) when it disciplined him for creating a hostile work environment?

2. Did the employer discriminate against Rudy Fisher, John Gollnick, Eric Reiber, Blake Richards, Chris Volk, Chris Wehrung, and Jason Wilkins in violation of RCW 41.56.140(1) when it conducted an investigation into allegations that they had retaliated against bargaining unit employees who provided the employer with adverse information about Reiber and when it disciplined Fisher, Gollnick, Richards, Volk, Wehrung, and Wilkins for engaging in retaliation?

Bolasina Decl, ECF No. 39-9, at 52. In a painstakingly-detailed decision issued on August 24, 2011, the PERC hearing examiner answered both questions in the negative. Bolasina Decl., ECF No. 39-9, at 135. This lawsuit followed.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant summary judgment in favor of a moving party who demonstrates "that there is no

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 11

genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" within the meaning of this rule if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A "genuine dispute" over any such fact exists only where there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party. *Id.* at 248.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party has the burden of proof at trial, the moving party need only demonstrate an absence of evidence to support the non-moving party's claims. *Id.* at 325. The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. In deciding whether this standard has been satisfied, a court must construe the facts, as well as all rational inferences therefrom, in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 327, 378 (2007).

**A. Collateral Estoppel (Issue Preclusion)**

Defendants seek dismissal of several claims on the ground that Plaintiffs are collaterally estopped from re-litigating issues which were previously decided by the PERC hearing examiner. Specifically, Defendants suggest that Plaintiffs

1    cannot establish unlawful retaliation and/or discrimination in violation of the First

2    and Fourteenth Amendments in light of the hearing examiner's finding that

3    Defendants did not engage in any retaliatory or discriminatory conduct.

4         Collateral estoppel, also known as issue preclusion, "is intended to prevent

5    retrial of one or more of the crucial issues or determinative facts determined in

6    previous litigation" between the same parties.  *Christensen v. Grant Cnty. Hosp.*

7    *Dist. No. 1*, 152 Wash.2d 299, 306 (2004) (quotation and citation omitted).  As

8    explained in *Christensen*,

9         Collateral estoppel may be applied to preclude only those issues that
         have actually been litigated and necessarily and finally determined in
10        the earlier proceeding.  Further, the party against whom the doctrine is
         asserted must have had a full and fair opportunity to litigate the issue
11        in the earlier proceeding.  For collateral estoppel to apply, the party
         [asserting it] must establish that (1) the issue decided in the earlier
12        proceeding was identical to the issue presented in the later proceeding,
         (2) the earlier proceeding ended in a judgment on the merits, (3) the
13        party against whom collateral estoppel is asserted was a party to, or in
         privity with a party to, the earlier proceeding, and (4) application of
14        collateral estoppel does not work an injustice on the party against
         whom it is applied.

15
16   152 Wash.2d at 307 (citations omitted).  Before giving preclusive effect to findings

17   made during an administrative proceeding, a court must also consider "(1) whether

     the agency acted within its competence, (2) the differences between procedures in
18
     the administrative proceeding and court procedures, and (3) public policy
19
     considerations."  *Id.* at 308.
20

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 13

The Court finds that collateral estoppel does not preclude Plaintiffs from litigating any of the issues identified by the Defendants. Although many of the issues presented in this lawsuit are similar to those decided in the PERC proceeding, the issues are not identical. Notably, the scope of the PERC proceedings was limited to determining whether the City of Pullman retaliated against Plaintiffs for engaging in *labor union activity*.

In this case, Plaintiffs have expressly disclaimed reliance upon their union activities to support their claims. *See* ECF No. 85 at 10 ("Plaintiffs are not asserting in this action that defendants were motivated by anti-union animus. To the extent that there are references in their Complaint to the contrary, they are no longer relevant. Plaintiffs acknowledge that PERC resolved those contentions with finality."). Hence, this case is unlike *Christensen*, in which the "identical issue" component of the collateral estoppel analysis was uncontested. *See id.* at 308. Given that the hearing examiner's findings of fact and conclusions of law were made in the rather narrow and specialized context of alleged labor union discrimination, the Court concludes that the issues decided in the PERC proceeding are not "identical enough" to be given preclusive effect in this case.

**B. Procedural Due Process Claim (Reiber Only)**

Plaintiff Reiber has asserted a claim for violations of his right to procedural due process under the Fourteenth Amendment. He alleges that Defendants

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 14

violated his rights by (1) failing to provide him with notice and an opportunity to be heard before placing him on paid administrative leave; and (2) "withholding relevant and exculpatory information" in the form of a memorandum written by J.T. until after his formal pre-suspension hearing.  ECF No. 85 at 31-44. Defendants contend that this claim fails as a matter of law because (1) Reiber was not entitled to any type of hearing prior to being placed on *paid* administrative leave; and (2) Reiber received adequate notice of the allegations contained in the J.T. memo prior to his pre-suspension hearing.  ECF No. 102 at 13-17.

The Court agrees that Reiber was not entitled to notice and an opportunity to be heard prior to being placed on paid administrative leave.  Although the issue does not appear to have been decided by the Ninth Circuit, several other circuits, as well as a Court in this District, have held that being placed on paid administrative leave does not implicate a protected property interest for purposes of a procedural due process claim.  *See Pitts v. Bd. of Educ. of U.S.D. 305, Salina, Kansas*, 869 F.2d 555, 556 (10th Cir. 1989) ("While suspension of a public employee without pay may infringe upon a property right, the two-day suspension *with* pay did not deprive Pitts of any measurable property interest.") (emphasis in original) (internal citation omitted); *Piscottano v. Murphy*, 511 F.3d 247, 288 (2d Cir. 2007) (holding that being placed on fully-paid administrative leave pending a *Loudermill* hearing does not give rise to a cognizable procedural due process claim); *Davis v. Dallas*

*Indep. Sch. Dist.*, 448 Fed. App'x 485, 495 (5th Cir. 2011) ("Placement on paid administrative leave does not constitute deprivation of a property interest."); *Stearns-Groseclose v. Chelan Cnty. Sheriff's Dep't*, 2006 WL 195788 (E.D. Wash. 2006) (unpublished) (holding that "suspension with pay does not implicate the Due Process Clause of the Fourteenth Amendment").  The Court finds these cases persuasive, and adopts their reasoning in full.  Reiber was not deprived of a protected property interest by being placed on paid administrative leave.

Further, Reiber's rights were not violated by Defendants' failure to produce the J.T. memorandum prior to the pre-suspension hearing.  As Defendants correctly note, due process does not require that an employer disclose all evidence in its possession in advance of a pre-suspension *Loudermill* hearing.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (explaining that, in the pre-deprivation context, "something less than a full evidentiary hearing is sufficient"); *Linton v. Frederick Cnty. Bd. of Cnty. Comm'rs*, 964 F.2d 1436, 1440 (4th Cir. 1992) ("Due process does not mandate that all evidence on a charge or even the documentary evidence be provided, only that such descriptive explanation be afforded as to permit [the employee] to identify the conduct giving rise to the dismissal and thereby to enable him to make a response."); *see also Moore v. King Cnty. Fire Protection Dist. No. 26*, 327 Fed. App'x 5, 6 (9th Cir. 2009)

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 16

1    (unpublished) (employer's failure to produce all of its evidence *at* employee's pre-

2    termination hearing did not violate due process).

3    Because a pre-suspension hearing serves merely as "an initial check against

4    mistaken decisions," an employer need only provide the employee with "notice of

5    the charges against him, *an explanation* of the employer's evidence, and an

6    opportunity to present his side of the story." *Loudermill*, 470 U.S. at 545-46

7    (emphasis added). That requirement was fully satisfied here, as Reiber was

8    provided with a copy of J.T.'s responses to Sires' interview questions prior to the

9    pre-suspension hearing. *See* ECF Nos. 38-6, 38-8. Accordingly, Defendants are

10   entitled to summary judgment on this claim.

11   **C. Substantive Due Process Claim (Reiber Only)**

12   Plaintiff Reiber has asserted a substantive due process claim based upon

13   alleged injury to his reputation. A terminated or disciplined public employee "has

14   a constitutionally based liberty interest in clearing his name when stigmatizing

15   information regarding the reasons for the [discipline] is publicly disclosed." *Cox v.*

16   *Roskelly*, 359 F.3d 1105, 1110 (9th Cir. 2004) (citing *Bd. of Regents v. Roth*, 408

17   U.S. 564, 573 (1972)). When an employee's liberty interest is implicated by

18   disciplinary action, the employer must afford the employee an opportunity to clear

19   his name. *Roth*, 408 U.S. at 573; *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169,

20   1179 (9th Cir. 1998). "Failure to provide a 'name-clearing' hearing in such a

1    circumstance is a violation of the Fourteenth Amendment's due process clause."

2    *Cox*, 359 at 1110.

3        Here, Defendants argue that summary judgment is appropriate because

4    Reiber declined Defendants Wilkins' express offer to conduct a name-clearing

5    hearing after his suspension was announced.  The Court agrees.  Although there

6    does not appear to be a published opinion directly on point in the Ninth Circuit,

7    several circuit courts have ruled that a plaintiff who fails to request a name clearing

8    hearing is precluded from asserting a substantive due process claim on an injury to

9    reputation theory.  *See Quinn v. Shirey*, 293 F.3d 315, 322 (6th Cir. 2002)

10   ("[B]efore asserting [a] liberty interest claim, [a] Plaintiff [is] required to show that

11   he requested a name-clearing hearing and was denied that opportunity."); *Gillum v.*

12   *City of Kerrville*, 3 F.3d 117, 121 (5th Cir. 1993) (listing a request for name-

13   clearing hearing and a subsequent denial of that request as elements of substantive

14   due process claim); *Winskowski v. City of Stephen*, 442 F.3d 1107, 1110 (8th Cir.

15   2006).  The reasoning in these cases applies with greater force where, as here, the

16   plaintiff was expressly offered a name-clearing hearing, but declined the

17   opportunity.  *See Klepper v. City of Page*, 206 Fed. App'x 692, 694 (9th Cir. 2006)

18   (unpublished) ("To the extent Klepper's due process claim was based on his liberty

19   interest in his reputation, the claim fails because he was offered a name clearing

20   hearing."); *Holscher v. Olson*, 2008 WL 2645484 at *13 (E.D. Wash. 2008)

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 18

1 (unpublished) (granting summary judgment on liberty interest claim where plaintiff

2 "made no effort to participate in a name-clearing hearing when given the

3 opportunity to do so").

4       Further, it is undisputed that Reiber participated in post-discipline grievance

5 arbitration pursuant to his union's collective bargaining agreement.  Participation

6 in such proceedings satisfies the "name-clearing" hearing requirement.  *Mustafa*,

7 157 F.3d at 1179.  There having been no violation of Reiber's right to substantive

8 due process, Defendants are entitled to summary judgment on this claim.

9    **D. First Amendment Retaliation Claim (All Plaintiffs)[3]**

10       Plaintiffs' First Amendment retaliation claim is based upon Defendants'

11 alleged violations of their rights to freedom of speech and freedom of association.

12 Specifically, Plaintiffs argue that they were retaliated against because of their

13 collective efforts to "forc[e] a fair, objective, and just investigation of the hostile

14 work environment charges against Eric Reiber."  ECF No. 85 at 45.  The parties

15 agree that this is a "hybrid" claim which should be evaluated as a single claim

16 rather than as separate freedom of speech and freedom of association claims.  *See*

17

18 [3] Plaintiff Reiber concedes that his First Amendment retaliation claims should be

19 dismissed, as his actions "were personal in nature and not undertaken on matters of

20 public concern."  ECF No. 85 at 46.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 19

*Hudson v. Craven*, 403 F.3d 691, 696 (9th Cir. 2005) (recognizing a "hybrid speech/association claim" where employee banded together with others to speak out on a particular issue).

To prevail on this claim, Plaintiffs must prove the following five elements: (1) that they spoke on a matter of public concern; (2) that they spoke as private citizens rather than as public employees; (3) that their protected speech was a substantial or motivating factor in Defendants' adverse employment actions; (4) that Defendants had no adequate justification for treating them differently from other members of the general public; and (5) that Defendants would not have taken the adverse employment actions in the absence of their protected speech. *Desrochers v. City of San Bernardino*, 572 F.3d 703, 708-09 (9th Cir. 2009). Defendants have moved for summary judgment on the grounds that (1) Plaintiffs did not speak on matters of public concern; and (2) Defendants had adequate justification for treating Plaintiffs differently than members of the general public in light of their substantial interest in "investigating and preventing hostile work environments and workplace retaliation." ECF No. 36 at 25-29.

The Court finds that Plaintiffs' First Amendment retaliation claim fails as a matter of law because they did not speak on matters of public concern. As Defendants correctly note, "[s]peech that deals with individual personnel disputes and grievances and that [is] of no relevance to the public's evaluation of the

performance of governmental agencies is generally not of public concern." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1069 (9th Cir. 2011) (quotations and citations omitted); *see also Brownfield v. City of Yakima*, 612 F.3d 1140, 1147 (9th Cir. 2010) (speech that "deals with individual personnel disputes and grievances such that the information would be of no relevance to the public's evaluation of the performance of governmental agencies" is not protected by the First Amendment) (internal quotation and citation omitted); *Roe v. City and Cnty. of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997) (for purposes of establishing speech on a matter of public concern, "[t]he focus must be upon whether the public or community is likely to be truly interested in the particular expression, or whether it is more properly viewed as essentially a private grievance"). For similar reasons, the fact that "poor interpersonal relationships amongst coworkers might hamper the work of a government office does not automatically transform speech on such issues into speech on a matter of public concern." *Desrochers*, 572 F.3d at 711.

Here, Plaintiffs have characterized their speech as a collective effort to "forc[e] a fair, objective and just investigation of the hostile work environment charges against Reiber," and to oppose "conduct they perceived as unfair, unjust and violative of a fellow employee's rights." ECF No. 85 at 45-46. A cursory review of the record, however, reveals that Plaintiffs' speech was decidedly less principled. Indeed, Plaintiffs' written submissions in "support" of Reiber

demonstrate that their primary objective was not to oppose the manner in which

Reiber was being investigated, but rather to disparage and undermine the

credibility of his accusers.  A few examples:

- Can you see how this hostile [work] environment complaint serves all their interests?  [C.T.] keeps her job regardless of the quality of her performance or her affair with [A.H.]; A.H. maintains a mistress in the workplace without any repercussions; [J.T.] and A.H. both sit on promotional lists and both stand to [be promoted] if Reiber is removed from his Captain position. [E.T.] probably believes he stands to gain if his buddies advance in the department.  It's a "win-win-win-win" situation for all of them.  ECF No. 38-10 at 22;

- [A.H.] has one of the dirtiest mouths in the department, has one of the raunchiest and least-respectful attitudes toward women that I have observed, and has allowed his sex life to completely infect this workplace, but is nevertheless perceived to be a stellar representation of how department members should behave.  ECF No. 38-10 at 30;

- I am suspicious that A.H., despite being married, has been engaged in an active sexual relationship with C.T.  C.T. has no interest in interacting, receiving training or socializing with the rest of us, choosing to focus on her relationship with A.H.  As her senior in the Department, and her primary (and apparently sole) trainer, this relationship would appear to be especially inappropriate during her probationary period.  Their interaction, and the obvious favoritism and protection that A.H. displays toward her, make the rest of us uncomfortable.  ECF No. 38-10 at 33.

- [J.T.], A.H., C.T. and E.T. are the ones responsible for pushing sexual matters in the face of the rest of us. . . . A.H. talks frequently in the workplace about his sexual activities with his wife, and their involvement in "S & M" and experiments with intercourse positions.  He has made many of us very uncomfortable.  A.H. frequently brought hard-core pornography magazines into the station until other members asked him to please stop.  A couple of years ago he asked that I supply him with Viagra, which I refused. ECF No. 38-10 at 35;

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 22

- The accusers behind this investigation are tied together tightly on and off the job. J.T.'s wife is employed as a caretaker of A.H.'s mother. E.T. is now separated from his wife and living with [A.H.'s family]. The [family] employ[s] C.T. in her off-duty time, both on their farm and in their household babysitting their children. (This also raises conflict issues, when C.T. is a probationary employee being trained by him, is working for him outside the Department, and has an active affair with him). It's a very troubling situation. ECF No. 38-10 at 39;

- My wife, M., and [J.T.'s wife] have been friends for a few years. They talk about life as fire fighter's wives and things that go on. [J.T.'s wife] told my wife that she and J.T. have had sexual intercourse on the fire engine. [J.T. and his wife] appear to enjoy discussing sexual matters, and are very open about their sexual adventures. My wife is prepared to testify to this should you wish further information. ECF No. 38-10 at 42.

The Court has little difficulty concluding that these statements do not touch upon matters of public concern. Almost nothing in these statements addresses matters of government misconduct or the department's ability to function effectively. *Cf. Karl*, 678 F.3d at 1069 (holding that employee's deposition testimony "offered in the course of a § 1983 lawsuit alleging violation of constitutional rights" was speech on a matter of public concern); *Gilbrook v. City of Westminster*, 177 F.3d 839, 866 (9th Cir. 1999) (holding that statements which called into question a "fire department's ability to respond effectively to life-threatening emergencies" addressed a matter of public concern). Instead, these statements are simply private grievances about personnel matters. *Brownfield*, 612 F.3d at 1148; *Desrochers*, 572 F.3d at 711. Whatever the merits of the accusations

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 23

1   in these complaints, they do not rise to the level of a public concern.  Accordingly,

2   Defendants are entitled to summary judgment.

3   **E. Equal Protection Claim (All Plaintiffs)**

4   Plaintiffs allege that Defendants violated their Fourteenth Amendment right

5   to equal protection by treating them differently than Reiber's accusers despite the

6   fact that both groups had engaged in similar conduct by reporting sexual

7   misconduct in the workplace.  *See* ECF No. 85 at 48-49.  This amounts to a "class

8   of one" equal protection claim.  *See Village of Willowbrook v. Olech*, 528 U.S. 562

9   (2000); *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008)

10  (explaining that a "class of one" equal protection claim is premised upon unique

11  treatment rather than membership in a protected class); *Lazy Y Ranch Ltd. v.*

12  *Behrens*, 546 F.3d 580, 592 (9th Cir. 2008) (a "class of one" plaintiff "does not

13  allege that the defendants discriminate against a *group* with whom she shares

14  characteristics, but rather that the defendants simply harbor animus against her *in*

15  *particular* and therefore treated her arbitrarily") (emphasis in original).

16  To prevail on a "class of one" equal protection claim, a plaintiff must prove

17  that the defendant "intentionally, and without rational basis, treated him differently

18  from others similarly situated."  *N. Pacifica LLC*, 526 F.3d at 486.  Unfortunately

19  for these Plaintiffs, "class of one" equal protection claims are not cognizable in the

20  public employment context:

[T]he class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context.  To treat employees differently is not to classify them in a way that raises equal protection concerns.  Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship.

*   *   *   *   *

In concluding that [this theory] has no application in the public employment context . . . we are guided, as in the past, by the "common-sense realization that government offices could not function if every employment decision became a constitutional matter."  *Connick* [*v. Myers*, 461 U.S. 138, 143 (1983)].  If . . . plaintiffs need not claim discrimination on the basis of membership in some class or group, but rather may argue only that they were treated by their employers worse than other employees similarly situated, any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal constitutional claim.  Indeed, an allegation of arbitrary differential treatment could be made in nearly every instance of an assertedly wrongful employment action—not only hiring and firing decisions, but any personnel action, such as promotion, salary, or work assignments—on the theory that other employees were not treated wrongfully.

*   *   *   *   *

In short, ratifying a class-of-one theory of equal protection in the context of public employment would impermissibly "constitutionalize the employee grievance."  *Connick*, 461 U.S., at 154. . . .  Public employees typically have a variety of protections from just the sort of personnel actions about which [the plaintiff] complains, but the Equal Protection Clause is not one of them.

*Engquist v. Oregon Dept. of Agric.*, 553 U.S. 591, 605, 607-08 (2008).  Thus,

Defendants are entitled to summary judgment on Plaintiffs' equal protection claim.

///

///

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 25

**F. Outrage Claim (Reiber Only)**

Plaintiff Reiber alleges that Defendants committed the common law tort of outrage.  The precise factual basis for this claim is unclear.  Reiber's complaint makes a generic allegation that "the facts set out in this Complaint constitute [D]efendants' commission of the tort of outrage against Plaintiff Reiber."  ECF No. 2 at ¶ 82.  His memorandum in opposition to the instant motion is similarly ambiguous; it merely asserts that "[t]he Declarations of Eric Reiber and Rudy Fisher have established" extreme and outrageous conduct on the part of the Defendants.  ECF No. 85 at 51.

When evaluating an outrage claim, a court must determine whether the conduct in question is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Dicomes v. State*, 113 Wash.2d 612, 630 (1989).  This is a highly fact-specific inquiry.  Given that Reiber has neither identified the *specific* conduct upon which his outrage claim is based nor attempted to tie that conduct to one or more of the named defendants, the Court finds it difficult to engage in any meaningful analysis of his outrage claim.

Having reviewed the declarations submitted by Plaintiffs Reiber and Fisher, however, the Court is unable to identify any conduct on the part of the Defendants that would qualify as extreme and outrageous.  Aside from Reiber's conclusory

1    allegations that Defendants "[knew] from the start that the[] charges were false,"

2    ECF No. 86 at ¶ 70, there is no evidence from which a rational jury could find that

3    Defendants' investigation of Reiber went "beyond all possible bounds of decency"

4    such that it would be "utterly intolerable in a civilized community." *Dicomes*, 113

5    Wash.2d at 630. Accordingly, Defendants are entitled to summary judgment on

6    this claim.

7         **G. Defamation and False Light Claims (All Plaintiffs)**

8         Plaintiffs have also asserted common law tort claims for defamation,

9    defamation by implication, and false light. ECF No. 2 at ¶¶ 83-88. Here again, the

10   precise factual basis for these claims is unclear. Defendants suggest that these

11   claims are based upon (1) the disciplinary sanctions issued to Plaintiffs (excluding

12   Reiber) for retaliating against Reiber's accusers; (2) the fact that Chief Wilkins

13   allegedly referred to Plaintiffs as a "wolf pack" in his disciplinary memorandum to

14   Reiber; and (3) the disciplinary sanction issued to Reiber for creating a hostile

15   work environment for C.T. ECF No. 36 at 36-37. Plaintiffs disagree, asserting

16   that Defendants have deliberately "misconstrued" the basis for their defamation

17   and false light claims. ECF No. 85 at 53. Plaintiffs do not, however, make any

18   meaningful attempt to clarify the *actual* basis for these claims.

19        In any event, Plaintiffs have failed to demonstrate any genuine issue of

20   material fact for trial. The common theme running throughout the Plaintiffs'

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 27

briefing is that Defendants conspired against them to perform a "corrupt

investigation" into charges which Defendants either knew or should have known

were based upon "conjured evidence":

> The whole investigation was set in motion with an enormously-injurious lie by J.T., and the lie was pursued with a vengeance by defendants because they were intent on taking Reiber down with it. They had nothing *but* J.T.'s lie to justify their profound mistreatment of Reiber, and later his defenders. Defendants concealed E.T.'s repudiation [of the allegation against Reiber] because it was clear proof of their unlawful conspiracy.

*   *   *   *   *

> The remaining six plaintiffs were subjected to deprivation of their rights by reason of the wrongful conspiracy initially targeting Reiber, to which they were viewed as an impediment by the defendants.

ECF No. 85 at 6, 11; *see also* ECF No. 85 at 4, 10, 23, 31, 33-34, 38- 41, 44, 47,

52-54.

Having thoroughly reviewed the record, the Court finds virtually no factual

support for this theory. The only evidence which could *arguably* support a finding

that Defendants conducted a "sham investigation" is the fact that E.T. expressly

denied the statement, attributed to him in J.T.'s April 28, 2009 memorandum, that

Reiber had asked for naked pictures of his wife. *See* ECF No. 84-7 at Tr. 42-45,

48-49; ECF No. 84-8 at Tr. 2349, 2356-59, 2371. Given that E.T. disavowed

having made that particular statement during the early stages of the investigation,

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 28

1    there is a modicum of support for Plaintiffs' position that Defendants should not

2    have pursued the matter further.

3        Nevertheless, the record reflects that the *tenor* of the statements attributed to

4    E.T. in the J.T. memorandum was largely on-point.  Indeed, E.T. himself testified

5    that a request for naked pictures of his wife was "in line with the type of

6    statements" that Reiber had actually made.  ECF No. 84-8 at Tr. 2371; *see also*

7    ECF No. 38-8 at 73 (clarifying that while he did not specifically recall Reiber ever

8    having requested naked pictures of his wife, "a request for explicit photos of my

9    wife is in-line with the type of statements [Reiber] made").  In addition, E.T.

10   explained to Defendant Sires that, in his opinion, J.T. had not deliberately

11   mischaracterized the nature of his comments concerning Reiber.  *See* ECF No. 38-

12   8 at 73.  Finally, E.T.'s wife went on record very early in the investigation to

13   memorialize her multiple conversations with Reiber in which Reiber "made

14   inappropriate comments with sexual undertones" which left her feeling

15   "uncomfortable."  ECF No. 38-8 at 74.

16       In view of this undisputed evidence, neither Reiber nor the other Plaintiffs

17   can prevail on their defamation, defamation by implication, and false light claims.

18   At bottom, there is simply no competent evidence from which a rational jury could

19   find that any of the Defendants acted either with knowledge of or in reckless

20   disregard to the falsity of the allegations against Reiber.  Thus, regardless of the

veracity of the underlying allegations, any statements made by Defendants during the course of their investigation are shielded by a conditional privilege. *See Lawson v. Boeing Co.*, 58 Wash. App. 261, 267 (1990) (even assuming falsity of underlying misconduct allegations, conditional privilege attaches to statements made by *investigating* employees during an investigation, absent evidence that employees knew of or recklessly disregarded the falsity of the allegations). As to the Defendants named in this lawsuit,[4] "there [has been] absolutely no showing of any malice, recklessness, or failure to examine the facts. They took statements, interviewed witnesses, and expressed their opinion that [misconduct] had occurred. As there [has been] no showing of any abuse or actual malice by the investigating employees, summary judgment [is] appropriate." *Id.*

**ACCORDINGLY, IT IS HEREBY ORDERED:**

Defendants' Motion for Partial Summary Judgment (ECF No. 34) is **GRANTED**. The following claims contained in Plaintiffs' Amended Complaint, ECF No. 2-1, are dismissed:

V.      14th Amendment Procedural Due Process claim,

VI.     14th Amendment Substantive Due Process claim,

---

[4] Plaintiffs have not sued the individuals who lodged the initial complaints against Reiber or the ensuing retaliation complaints.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 30

VII.    Violation of Equal Protection,

VIII.   1st Amendment Free Speech claim,

IX.     1st Amendment Right of Association claim,

XIII.   Tort of Outrage,

XIV.    Defamation claim,

XV.     Defamation by Implication claim, and

XVI.    False Light claim.

The District Court Executive is hereby directed to enter this Order and provide copies to counsel.

**DATED** this 14th day of January, 2013.

*s/ Thomas O. Rice*

THOMAS O. RICE
United States District Judge