1

2

3

4

5          UNITED STATES DISTRICT COURT

6          EASTERN DISTRICT OF WASHINGTON

7   ERIC REIBER, et al.,

8                    Plaintiffs,              NO:  11-CV-0129-TOR

9        v.                                   ORDER GRANTING DEFENDANTS'
                                              RENEWED MOTION FOR
10  CITY OF PULLMAN, et al.,                  JUDGMENT AS A MATTER OF LAW

11                   Defendants.

12

13        BEFORE THE COURT are Plaintiffs' Motion for Attorney's Fees (ECF No.

14  167) and Defendants' Renewed Motion for Judgment as a Matter of Law (ECF No.

15  183).  These matters were heard with oral argument on July 2, 2013.  Patricia B.

16  Urquhart appeared on behalf of the Plaintiffs.  Michael C. Bolasina appeared on

17  behalf of the Defendants.  The Court has reviewed the briefing and the record and

18  files herein, and is fully informed.

19  //

20  //

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 1

INTRODUCTION

What should an employer do when two factions of employees accuse each other of unlawful discrimination?  Should the employer investigate both sets of complaints?  Neither?  Only those complaints it deems facially credible?

If the employer chooses to investigate, how should it proceed when one faction appears to be retaliating against the other during the investigation?  What if the other faction lodges a formal retaliation complaint?  Should the employer investigate *that* complaint?  Or should it simply ignore the complaint, declare the entire matter closed, and tell everyone to get back to work?

PROCEDURAL HISTORY

Plaintiffs filed this action on April 1, 2011, alleging causes of action for (1) violations of their right to procedural due process; (2) violations of their right to substantive due process; (3) violations of their right to equal protection; (4) violations of their right to freedom of speech; (5) violations of their right to freedom of association; (6) outrage; (7) defamation; (8) defamation by implication; (9) false light; (10) retaliation in violation of Title VII; and (11) retaliation in violation of the Washington Law Against Discrimination ("WLAD").  ECF No. 2. Defendants moved for partial summary judgment on all claims except the Title VII and WLAD retaliation claims on November 9, 2012.  ECF No. 34.  The Court granted the motion on January 14, 2013.  ECF No. 107.  Plaintiffs moved for

reconsideration on January 24, 2013.  ECF No. 114.  The Court denied the motion on January 28, 2013.  ECF No. 124.

The retaliation claims proceeded to a jury trial on March 25, 2013. Defendants moved for judgment as a matter of law at the close of Plaintiffs' case, arguing that Plaintiffs had failed to establish a prima facie case of retaliation under both Title VII and the WLAD.  The Court reserved ruling on the motion, and the case was submitted to the jury.  On April 2, 2013, the jury returned a verdict in favor of the Plaintiffs and against the Estate of Patrick Wilkins and the City of Pullman.  ECF No. 161.  The jury found in favor of Defendants Karen Sires and John Sherman in their individual capacities.  ECF No. 161.  The jury awarded damages to Plaintiff Eric Reiber in the amount of $325,800 and to Plaintiffs Rudy Fisher, Christopher Volk, John Gollnick, Jason Wilkins[1], and Christopher Wehrung in the amount of $135,000 each, for a total award of $1,000,800.  ECF No. 161.

Plaintiffs moved for an award of attorney's fees and costs on April 12, 2013. ECF No. 167.  Defendants filed a timely renewed motion for judgment as a matter of law on May 1, 2013.  ECF No. 183.  On that same date, Plaintiffs appealed the

[1] Plaintiff Jason Wilkins is not related to Defendant Patrick Wilkins who is referred to throughout as "Chief Wilkins."

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 3

Court's grant of partial summary judgment to the Ninth Circuit Court of Appeals. ECF No. 179.  That Court has held its proceedings in abeyance pending resolution of the instant motions.  ECF No. 188.

FACTS[2]

At all times relevant to this case, Plaintiffs were firefighters with the City of Pullman Fire Department.  Plaintiff Eric Reiber ("Reiber") held the rank of Captain, Plaintiff Rudy Fisher ("Fisher") held the rank of Lieutenant, and the remaining four Plaintiffs held various lower ranks.  In his role as Captain, Reiber supervised firefighters assigned to the "C" shift, one of three rotating shifts at the Department's main station in Pullman.  Reiber was also the president of his labor union, the International Association of Fire Fighters Local 1892.  Fisher and Plaintiff Christopher Volk ("Volk") served as the union's vice president and secretary/treasurer, respectively.

In late 2008, Fisher and several other firefighters observed what they perceived as inappropriate interactions between a male firefighter named Andrew Howell ("Howell") and a female probationary firefighter named Chelsea Tadema

---

[2] The sole purpose of this section is to provide context to the legal issues addressed in this Order.  The statements in this section are not findings of fact and should not be construed as such.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 4

("Tadema").  In broad terms, Fisher and his colleagues observed Howell and Tadema spending more time together around the firehouse than was typical of two firefighters assigned to separate shifts.  After observing this "suspicious" behavior for several weeks, Fisher decided to approach senior command staff about the issue.  To that end, Fisher met with Operations Chief Mike Heston ("Heston") on October 12, 2008, and reported his suspicions that Howell and Tadema were having an extramarital affair.  Reiber was also present during the meeting.  Heston addressed the matter privately with Howell later the same day.

Howell confronted Fisher about his meeting with Heston a short time later, warning Fisher that his interactions with Tadema were not a Department concern.  Fisher disagreed, stating that he and other firefighters felt "uncomfortable" around Howell and Tadema.  At the conclusion of their discussion, Fisher instructed Howell to reduce his level of interaction with Tadema around the firehouse.

In early 2009, Tadema rotated onto the "C" shift under Reiber's command.  Shortly thereafter, several members of the shift complained to Reiber that Tadema was not acting with the level of humility and initiative expected of a probationary firefighter.  After speaking with Tadema about the issue, Reiber concluded that Tadema "does not appear to consider herself a probie, is above some of the tasks expected of all line firefighters, shirks chores, and feels that it is appropriate to advance her agenda in direct conflict with the plans, desires, or orders of her senior

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 5

firefighter[s]."  Reiber reminded Tadema of her probationary status and told her

that she needed to be a better "team player."  A few weeks later, Tadema received

the same feedback from Heston during a regularly-scheduled performance review.

Tadema left this meeting with the impression that her job was in jeopardy.

One day later, Captain James Turpin ("Turpin") complained to Defendant

Chief Wilkins ("Chief Wilkins") that Reiber was subjecting Tadema to a hostile

work environment.  In a document which has become known as the "Turpin

Memorandum," Turpin conveyed the following: (1) that Tadema had complained

to him about Reiber evaluating her unfairly while she was under Reiber's

command; (2) that Tadema had complained to him about Reiber touching her on

the back and shoulder and pulling her ponytail; (3) that Tadema and two other

firefighters had complained to him about Reiber displaying excessive anger around

the firehouse; (4) that a firefighter named Erik Taylor ("Taylor") had complained

to him about Reiber making inappropriate sexual comments to his wife on the

telephone and asking for nude pictures of his wife; and (5) that several members of

the Department had complained to him about Reiber having a "negative attitude"

and engaging in "backroom chats and negativity."  A few days later, Tadema

lodged a formal complaint on her own behalf, alleging that Reiber had treated her

unfairly during her time on the "C" shift and demanding to be transferred to a

different shift.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 6

1    Chief Wilkins subsequently placed Reiber on paid administrative leave and

2    asked the City of Pullman's Human Resources Manager, Defendant Karen Sires

3    ("Sires"), to conduct an internal investigation.  Sires interviewed approximately

4    twenty firefighters, including Reiber, from a list of prepared interview questions.

5    On May 22, 2009, while the investigation was still pending, Sires received a

6    fifteen-page written "rebuttal" statement from Reiber.

7        At the conclusion of her investigation, Sires submitted a written report to

8    Chief Wilkins.  Her report concluded that Reiber had subjected Tadema to a hostile

9    work environment by, *inter alia*, calling her a "scrawny blonde" in front of other

10   firefighters, pulling her hair, polling other firefighters about whether she was

11   acting "probie" enough, and pressuring her to participate in group meals.  The

12   report also documented other instances of inappropriate behavior, including

13   sexually suggestive comments made to firefighters' wives, demeaning comments

14   addressed to other firefighters, and reported requests for naked photographs of

15   firefighters' wives.

16       After reviewing the investigative report, Chief Wilkins decided to

17   permanently demote Reiber to the rank of firefighter.  Chief Wilkins sent Reiber a

18   "Notice of Intent to Discipline" dated June 8, 2009, advising Reiber as follows:

19           I have completed the review of the [investigative] report, and I have
             determined that there are a significant number of witness statements
20           supporting the finding that in your role as a supervisor you have
             created, encouraged, and condoned an environment that is

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 7

1    unwelcoming and unprofessional, and you employ intimidation,
2    humiliation, and demeaning language and behavior towards those
     individuals who do not conform to your management style.

3                              *    *    *

4    You have acknowledged on several occasions your responsibility to
     be aware of an abide by the [Department's] policies, and have not
5    only disregarded that responsibility, but allowed and condoned those
     that you were entrusted to supervise to participate in similar types of
6    behavior; thus grossly failing to perform the duties of your position as
     a Fire Captain and calling into question your ability to perform in a
7    supervisor role in the Pullman Fire Department.

8        Reiber appeared for a pre-disciplinary hearing before Chief Wilkins and

9    Sires on June 24, 2009.  Several other members of the Department accompanied

10   him to the hearing.  Chief Wilkins allowed Reiber to speak on his own behalf, but

11   required any other potential witnesses to submit written statements rather than live

12   testimony.  After the hearing, Reiber and the other Plaintiffs submitted written

13   statements to Chief Wilkins.  Reiber's statement was styled as a "rebuttal" to

14   Sires's investigative report, while the other Plaintiffs' statements bore the subject

15   line "Investigation of the Conduct of Captain Eric Reiber and his Accusers."  In

16   these statements, Reiber and the other Plaintiffs generally denied the allegations

17   against Reiber and complained that Reiber's "accusers" (namely Tadema, Howell,

18   Turpin and Taylor) had engaged in similar or worse misconduct.

19       Chief Wilkins announced Reiber's discipline on July 10, 2009.  His "Final

20   Determination" letter stated, in part:

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 8

The initial purpose of the investigation was to determine whether your performance as a supervisor had resulted in a hostile and otherwise inappropriate work environment for Chelsea Tadema. During the course of the investigation, Ms. Sires learned additional information that supported Ms. Tadema's claims and described a pattern of behavior by you that included making rude and demeaning comments towards other co-workers and the public, touching other employees in a manner that is not appropriate for the workplace, and creating a work environment that, for at least one employee, was unwelcoming and offensive due to your personal behavior and your acts as a supervisor condoning inappropriate behavior of subordinates.

During the investigative interview, you either admitted or did not deny all behavior attributed to you with the exception of asking colleagues or their wives for naked photos of the wives. This accusation I found to be credible.

You admitted to calling other individuals in the workplace "buttmunch," "dickscratch," and "dickhead." Such name calling is a violation of the City policy requiring employees to treat the public or fellow employees with courtesy, and encourages subordinates to behave in a similarly offensive and unprofessional manner. As a supervisor, you are charged with the duty of not only following the policy, but making sure your employees do so as well. You have failed on both parts.

You admitting [sic] making sexually suggestive comments to and about other members of the Pullman Fire Department and the public, including other firefighters' wives. You stated during our meeting that you were only joking, and that you intended no offense, for example, when suggesting that the children of other firefighters were fathered by you. Those statements are objectively offensive, and others did not disregard your comments as a harmless joke. During your hearing you dismissed the feelings of those that have been offended by your behavior by stating that you were a very passionate person.

\*    \*    \*

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 9

Perhaps most importantly, the investigation showed that your skill as a tactical firefighter did not translate into skill as a supervisor of other firefighters. The manner in which you handled issues regarding Ms. Tadema, once she was placed on C shift, amply demonstrates this. You have developed a dysfunctional leadership style in which you maintain power, control and obeisance by making subordinate employees insecure in their status, afraid of falling out of your favor, and beholden to you for their comfort and success. What you have accomplished is molding a group of firefighters who are loyal to you, and not to the City or the department. While this style might work in the fire departments of old, or in wolf packs of today, it does not work in the diverse, modern work place where policies and procedures govern the employer/employee relationship, and much of what you have either done or allowed under your watch is clearly prohibited.

Your Guild representative [Fisher] emphasized that the investigation was flawed and incomplete because issues you raised at the hearing regarding those that provided testimony against you were not investigated. I have asked Ms. Sires to look into those issues separately. In sum, the offenses of others do not exonerate you, particularly when you had an obligation to correct their behavior if you knew about it, as the statements assert. The investigation of the complaint against you may have revealed a more widespread problem at the Pullman Fire Department that, if proven, will result in a more widespread fix. It is my intention that any and all sexually and other offensive conduct in the workplace will cease.

Chief Wilkins concluded the letter by informing Reiber that he would be

suspended for one month without pay, followed by a temporary six-month

demotion to the rank of firefighter.

Reiber grieved this discipline to the City Supervisor, Defendant John

Sherman ("Sherman") on July 22, 2009. A grievance hearing was held on July 28,

2009. On August 10, 2009, Sherman issued a decision largely affirming the

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 10

discipline imposed by Chief Wilkins.  In reaching this conclusion, Sherman

observed, *inter alia*:

> It is very disturbing to me that the whole tenor of the grievance of the
> discipline of Captain Reiber is full of denials, rationalization of
> inappropriate actions, or pointing the finger at others who he deems to
> have committed similar offenses or worse.

> \*   \*   \*

> I am very hopeful that Captain Reiber will correct his blatantly
> inappropriate behavior and regain his rank of Captain.  However,
> offensive actions that create a hostile work environment cannot and
> will not be tolerated.  Within the July 22, 2009 grievance, many
> accusations about various sordid acts are made against others.  An
> investigation is underway and disciplinary action will be taken as
> deemed appropriate for those work-related violations, as was done in
> this case.

In the weeks that followed, Sires investigated the allegations that had been

leveled against Tadema, Howell, Turpin and Taylor during the investigation into

Reiber's conduct.  As she had done during her prior investigation, Sires

interviewed employees with potentially relevant knowledge from a series of

uniform interview questions.  Based upon these interviews, Sires concluded that

many of the accusations of misconduct were not supported.  In a written summary

of the investigation, Sires first expressed concern about whether Reiber and the

other Plaintiffs had personal knowledge of the misconduct referenced in their

statements:

> A number of the allegations submitted by Eric Reiber, Rudy Fisher,
> Blake Richards, and Chris Wehrung were identical.  Although each

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 11

was submitted separately, and signed as their individual statements, the wording in many instances is identical. The statements contain many allegations prefaced with words such as "apparently, seems to be, probably," etc. The statement signed and submitted by Eric Reiber is written in the third person.

When Eric Reiber was questioned about the allegations contained in his statement, he stated that he did not make those statements. The memorandum from him and signed by him was prepared by Pat Urquhart and he indicated the statements made within the memorandum were not his but hers.

In an attempt to determine what the individuals providing statements did or did not see or say, interviews were conducted for clarification.

Sires then summarized her findings with respect to each of the four accused of misconduct. Generally, Sires found that Tadema, Turpin and Taylor had not engaged in any actionable misconduct. As to Howell, Sires concluded that his "behavior ha[d] been inappropriate and offensive," but that the more serious allegations against him were unsubstantiated. Howell was subsequently issued a written reprimand by Chief Wilkins.

In the weeks that followed, Turpin and Howell lodged formal complaints with Chief Wilkins, alleging that Reiber and the other Plaintiffs had retaliated against them during the initial hostile work environment investigation and thereafter. The substance of these allegations was that Reiber and the other Plaintiffs had falsely and deliberately accused them of serious misconduct in retaliation for their having previously accused Reiber of creating a hostile work environment. After receiving the complaints, the City hired a private attorney,

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 12

Beth Kennar ("Kennar") to investigate whether any unlawful retaliation had occurred.

Kennar investigated the complaint over the next several weeks. After interviewing Reiber and the other Plaintiffs, Turpin and Howell, and others with potential knowledge, Kennar concluded that all of the Plaintiffs except Reiber had engaged in unlawful retaliation. In reaching this conclusion, Kennar found that Fisher, Volk, Gollnick, Wehrung and Wilkins (1) lacked an adequate factual basis for their allegations against Turpin and Howell; and (2) had admitted to making these allegations in retaliation for Turpin's and Howell's complaints against Reiber. After reviewing the results of Kennar's investigation, Chief Wilkins disciplined Fisher with a 30-day suspension without pay and a permanent demotion to firefighter, Gollnick and Wehrung with a six-day suspension without pay, and Volk and Wilkins with a three-day suspension without pay.

These Plaintiffs grieved their discipline to Sherman on June 17, 2010. A grievance hearing was held on July 6, 2010. At the hearing, Sherman adopted a more lenient evidentiary standard than that previously applied by Kennar: "If an individual grievant provided empirical or factual specific proof in support of a generalized accusation against Firefighter Andrew Howell or Lieutenant James Turpin, and further stated that he believed that to be factually correct, I have accepted that proof as sufficient to disprove retaliation." Applying this standard,

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 13

Sherman concluded that none of the Plaintiffs had submitted knowingly false accusations.  Based upon this finding, Sherman reversed Chief Wilkins' discipline as to all Plaintiffs except Wilkins, whose suspension was reduced from three days to two based upon his prior disciplinary record.  Wilkins' reduced suspension was subsequently reversed by an arbitrator at a later stage of the grievance process.

DISCUSSION

**A. Defendant's Motion for Judgment as a Matter of Law**

Motions for judgment as a matter of law are governed by Federal Rule of Civil Procedure 50.  Rule 50(a) allows a party to move for judgment in its favor at the close of the opposing party's case-in-chief.  If the court finds that "a reasonable jury would not have a legally sufficient evidentiary basis" to find in favor of the non-moving party, it may grant the motion, discharge the jury, and enter judgment for the moving party.  Fed. R. Civ. P. 50(a).  If the court withholds ruling on the motion, however, the court is deemed to "have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."  Fed. R. Civ. P. 50(b).  If the moving party renews the motion within 28 days after the entry of judgment on the verdict, the court must make a final ruling.  In ruling on the renewed motion, the court may (1) affirm the entry of judgment on the verdict; (2) order a new trial; or (3) award judgment to the moving party as a matter of law. Fed. R. Civ. P. 50(b).  The purpose of utilizing this renewed motion procedure is to

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 14

1    avoid the unnecessary expense and inconvenience of a new trial in the event that

2    judgment as a matter of law is granted and subsequently reversed on appeal.  *See*

3    *Craighead v. Missouri Pac. Transp. Co.*, 195 F.2d 652, 657 (8th Cir. 1952).

4         The standard of review applicable to post-verdict motions under Rule 50(b)

5    is narrow: the court's sole objective is to determine whether, "under the governing

6    law, there can be but one reasonable conclusion as to the verdict."  *Winarto v.*

7    *Toshiba Am. Elec. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001).  The

8    court must construe the evidence, and draw all reasonable inferences therefrom, in

9    the light most favorable to the non-moving party.  *Pavao v. Pagay*, 307 F.3d 915,

10   918 (9th Cir. 2002); *Winarto*, 274 F.3d at 1283.  The court must also take special

11   care to avoid substituting its judgment for that of the jury.  To that end, the court

12   must refrain from weighing the evidence and making credibility determinations.

13   *Winarto*, 274 F.3d at 1283; *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th

14   Cir. 2007).  In sum, a renewed motion for judgment as a matter of law may only be

15   granted when the evidence presented at trial "permits *only one reasonable*

16   *conclusion*, and that conclusion is contrary to the jury's verdict."  *Pavao*, 307 F.3d

17   at 918 (emphasis added).

18        Defendants maintain that the jury's verdict on Plaintiffs' retaliation claims is

19   not supported by substantial evidence.  A plaintiff asserting a retaliation claim

20   must prove that (1) he engaged in protected activity; (2) he suffered adverse

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 15

employment action; and (3) there was a causal relationship between the two.  The

showings required under both Title VII and the WLAD are identical, save for the

causation element; under Title VII, the plaintiff must prove that his protected

activity was the "but-for" cause of the adverse employment action, while under the

WLAD the plaintiff must merely demonstrate that his protected activity was a

"substantial factor" in the employer's decision to take the adverse employment

action.  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, --- U.S. ---, 133 S. Ct. 2517, 2521

(2013) (holding that "Title VII retaliation claims require proof that the

[employer's] desire to retaliate was the but-for cause of the challenged

employment action"); *Allison v. Hous. Auth. of City of Seattle*, 118 Wash.2d 79,

55-96 (1991) (rejecting "but-for" standard of causation in favor of more lenient

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 16

"substantial factor" standard).[3]  In the instant motion, Defendants assert that Plaintiffs failed to adequately prove the first (protected activity) and third (causation) elements of their claims.

    1. <u>Plaintiff Reiber (WLAD Only)</u>

At trial, Plaintiff Reiber argued that he was retaliated against for engaging in three distinct forms of protected activity: (1) attending the October 21, 2008 meeting at which Fisher voiced suspicion about Tadema and Howell engaging in an extramarital affair;[4] (2) counseling Tadema about the need to become a better

_____

[3] Whether Washington courts will continue to adhere to the "substantial factor" standard after *Nassar* remains an open question.  The Washington Supreme Court's adoption of this standard in *Allison* rested, in part, upon the Court's perception that federal courts had moved away from "but-for" causation in Title VII retaliation cases.  *See Allison*, 118 Wash.2d at 91.  In light of the U.S. Supreme Court's recent endorsement of the "but for" standard in *Nassar*, however, Washington courts may be called upon to reconsider the appropriate standard under the WLAD.

[4]  Plaintiffs' counsel contends that the jury implicitly found that this alleged affair actually occurred.  Contrary to counsel's assertions, the jury made no such finding.  Further, the testimony about the alleged affair was conflicting.  While certain

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 17

"team player" while she was under his command; and (3) referencing the details of the alleged affair in response to Tadema's hostile work environment complaint. *See* ECF No. 187 at 10-19.  Reiber's theory of the case was that Defendants used Tadema's hostile work environment complaint as an opportunity to ruin his career. Specifically, Reiber argued to the jury that Defendants investigated the complaint—and subsequently imposed discipline—in the face of clear evidence that Tadema's allegations were entirely fabricated.  ECF No. 187 at 25.  In more colloquial terms, Reiber's theory the case was that Defendants willfully "colluded" with Tadema, Turpin, Howell and Taylor with the intent to retaliate against him for his role in exposing the alleged affair.

### a.  Protected Activity

The WLAD's anti-retaliation provision is set forth at RCW 49.60.210(1). The statute provides, in relevant part:

> It is an unfair practice for any employer . . . to discharge, expel, or
> otherwise discriminate against any person because he or she has
> opposed any practices forbidden by this chapter, or because he or she

---

witnesses testified that they "supposed" an affair was afoot, Tadema categorically denied having an affair during her testimony.  The references to the alleged affair in this decision should not be construed as a finding that an affair actually occurred.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 18

has filed a charge, testified, or assisted in any proceeding under this chapter.

RCW 49.60.210(1).  This provision provides protection from retaliation under two circumstances: "(1) when an employee opposes forbidden practices[,] and (2) when an employee files a charge, testifies, or assists in a proceeding." *Lodis v. Corbis Holdings, Inc.*, 172 Wash. App. 835, 848 (2013).  Consistent with Title VII case law, conduct in the former category is typically described as "opposition" activity, while conduct in the latter is generally referred to as "participation" activity.[5]  *Id.*

As noted above, Reiber claims to have engaged in three distinct protected activities.  The distinctions between these activities, however, are rather nuanced.  Accordingly, the Court will attempt to explain Reiber's theory of protected activity in some detail before addressing whether any of the three asserted activities are protected under the WLAD.

Reiber asserts that he began engaging in protected activity on October 21, 2008, when he attended the meeting at which Fisher expressed concern that Tadema and Howell were engaged in an extramarital affair.  According to Reiber, this meeting marked the beginning of a "proceeding" under the WLAD because Fisher's statements put the Department "on legally sufficient notice" that the

_____

[5] Unlike Title VII, the WLAD does not specifically reference "participation."  *See* RCW 49.60.210(1).

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 19

1    alleged affair was creating a sexually hostile work environment.  ECF No. 187 at

2    13.  Given that Defendants had a "duty to investigate" these allegations, Reiber

3    asserts, his attendance at the meeting—as well as his subsequent counseling of

4    Tadema—was protected "participation" activity.

5         Reiber contends that this "participation" activity was transformed into

6    "opposition" activity on May 23, 2009, when he submitted a written rebuttal to

7    Tadema's hostile work environment complaint.  As far as the Court can discern,

8    Reiber's theory is that Defendants effectively forced him to transition from

9    "participation" mode to "opposition" mode by neglecting to address the alleged

10   affair during their initial investigation.  Because he could not have defended

11   himself effectively without discussing the alleged affair, Reiber argues, his

12   statements during the course of the hostile work environment investigation amount

13   to protected "opposition" activity.

14        Finally, in an argument which the Court construes as having been raised in

15   the alternative, Reiber contends that statements made in his own defense during the

16   hostile work environment investigation were protected "participation" activity.

17   The premise of this argument is that City's hostile work environment investigation

18   was a "proceeding under [the WLAD]" within the meaning of RCW 49.60.210(1).

19   Given that his statements were made during the course of this "proceeding," Reiber

20   argues, any discipline flowing therefrom amounts to unlawful retaliation.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 20

1    With these arguments in mind, the Court turns to the merits of Reiber's

2  claims.  As a threshold matter, the Court must address what appears to be an issue

3  of first impression in Washington: whether statements made during an employer's

4  internal investigation amount to protected "participation" activity under the

5  WLAD.  Federal courts applying Title VII have uniformly held that participating in

6  an employer's internal investigation is not protected activity.  *See, e.g.*,

7  *Vasconcelos v. Meese*, 907 F.2d 111, 113 (9th Cir. 1990); *Townsend v. Benjamin*

8  *Enter., Inc.*, 679 F.3d 41, 49-50 (2d Cir. 2012); *Hatmaker v. Mem'l Med. Ctr.*, 619

9  F.3d 741, 747 (7th Cir. 2010); *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171,

10  1174 (11th Cir. 2000); *but see Crawford v. Metro. Gov't of Nashville & Davidson*

11  *Cnty.*, 555 U.S. 271, 280 (2009) (declining to reach this issue).  As the Seventh

12  Circuit explained in *Hatmaker*, Title VII only protects participation in an

13  investigation undertaken in conjunction with a formal charge of discrimination

14  filed with the United States Equal Employment Opportunity Commission:

15      The "investigation" to which [42 U.S.C. § 2000e-3] refers does not
16      include an investigation by the employer, as distinct from one by an
         official body authorized to enforce Title VII. . . . The participation
17      clause prohibits retaliation against an employee who "has made a
         charge, testified, assisted, or participated in any manner in an
18      investigation, proceeding, or hearing under" Title VII.  A purely
         internal investigation does not involve a "charge," or testimony, and
19      neither is it a "proceeding" or a "hearing."  To bring an internal
         investigation within the scope of the clause we would have to rewrite
20      the statute.  We therefore join the courts that interpret the participation
         clause as being limited to official investigations.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 21

1   619 F.3d at 746-47; *see also Vasconcelos*, 907 F.2d at 113 ("Accusations made in

2   the context of charges before the [EEOC] are protected by statute; charges made

3   outside that context are made at the accuser's peril.").

4        The WLAD's participation clause closely tracks its Title VII counterpart.

5   *Compare* 42 U.S.C. § 2000e-3(a) (unlawful to discriminate against an employee

6   "because he has made a charge, testified, assisted, or participated in any manner in

7   an investigation, proceeding, or hearing under this subchapter"), *with* RCW

8   49.60.210(1) (unlawful to discriminate against an employee "because he or she has

9   filed a charge, testified, or assisted in any proceeding under this chapter").  In light

10  of the textual similarity between these two provisions, there is reason to believe

11  that Washington courts would follow Title VII case law concluding that statements

12  made during the course of an employer's internal investigation are not protected.

13  *See Short v. Battle Ground Sch. Dist.*, 169 Wash. App. 188, 196 (2012) (courts in

14  Washington may look to cases applying Title VII as a "source of guidance" when

15  interpreting similar provisions of the WLAD) (citation omitted).

16       It also bears noting that the WLAD's anti-retaliation provision is narrower in

17  scope than its Title VII counterpart.  As noted above, the WLAD protects

18  employees who have "filed a charge, testified, or assisted" in a proceeding under

19  the WLAD.  RCW 49.60.210(1).  Title VII, by contrast, protects those who have

20  "made a charge, testified, assisted, *or participated in any manner*" in a matter

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 22

1    cognizable under Title VII.  42 U.S.C. § 2000e-3(a) (emphasis added).  In addition,

2    Title VII references participation in "an *investigation*, proceeding or hearing," 42

3    U.S.C. § 2000e-3(a) (emphasis added), while the WLAD merely references "any

4    proceeding," RCW 49.60.210(1).  These subtle differences make the reasoning in

5    the Title VII cases cited above even more persuasive.

6          The Court is mindful that the WLAD must be construed liberally.  *See Lodis*,

7    172 Wash. App. at 850.  Nevertheless, construing an employer's internal

8    investigation as a "proceeding under [the WLAD]" is simply not a plausible

9    interpretation of the statutory text.  Such an interpretation would stretch the scope

10   of the statute, causing it to become unhinged from the legislature's wording.  Thus,

11   the Court concludes that Reiber was not engaged in protected "participation"

12   activity when he (1) attended the meeting in Heston's office;[6] and (2) made

13   statements about the alleged affair during the hostile work environment

14   investigation.

15         Further, assuming *arguendo* that participation in an employer's internal

16   investigation *could* qualify as protected "participation" activity under the WLAD,

17

18   [6] For reasons discussed in further detail below, the Court rejects Reiber's assertion

19   that this meeting was the beginning of a "proceeding" to investigate alleged

20   discrimination.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 23

1   Reiber's arguments would still fail.  Contrary to Reiber's assertions, reporting a

2   suspected affair between co-workers is not protected activity.  True to its name, the

3   Washington Law Against Discrimination prohibits *discrimination* on the basis of a

4   broad range of protected characteristics.  RCW 49.60.010.  A consensual sexual

5   relationship between two co-workers (whether extramarital or otherwise) does not

6   involve *any* form of discrimination, much less discrimination on the basis of a

7   protected characteristic.  Thus, "opposing" such conduct—or "participating in a

8   proceeding" to determine whether it occurred—is not protected.

9        In an effort to sidestep this obvious absence of discrimination, Reiber argues

10  that he and Fisher *reasonably believed* that an affair violated the WLAD.  The

11  Court acknowledges that an employee who reasonably believes that he or she is

12  opposing unlawful discrimination is entitled to protected status, regardless of

13  whether the conduct at issue actually violates the WLAD.  *Renz v. Spokane Eye*

14  *Clinic, P.S.*, 114 Wash. App. 661, 619-20 (2002); *accord Trent v. Valley Elec.*

15  *Ass'n Inc.*, 41 F.3d 524, 526-27 (9th Cir. 1994).  Nevertheless, there was no

16  evidence presented on this issue at trial.  Notably, Reiber did not testify that he

17  "opposed" the alleged affair (or "participated" in an investigation into the same)

18  because he subjectively believed that it violated the WLAD.  To the contrary,

19  Reiber testified that he was *not* bothered by the alleged affair and that his only

20  objective was to help Tadema correct her co-workers' untoward perceptions.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 24

1    Nor did Fisher claim to have subjectively believed that the alleged affair

2  violated state or federal anti-discrimination laws.  Instead, Fisher testified that he

3  complained about the alleged affair because he felt that it was "inappropriate,"

4  because it violated Pullman Fire Department policy, and because it was making

5  other firefighters feel "uncomfortable."  No reasonable jury could have concluded

6  from this testimony that Reiber or Fisher *reasonably believed* that he was opposing

7  unlawful *discrimination*.  In any event, even if they had so testified, no reasonable

8  jury could have found that such a belief was *objectively* reasonable under the

9  circumstances.  Again, the alleged affair simply did not involve any conceivable

10  form of discrimination.

11    At oral argument, Plaintiffs' counsel also argued that the alleged affair

12  violated the WLAD because Howell was Tadema's supervisor.  How a *consensual*

13  sexual relationship between a supervisor and a subordinate might implicate the

14  WLAD is entirely unclear.  There are two types of sexual discrimination claims

15  cognizable under the WLAD: "the quid pro quo sexual harassment claim, where

16  the employer requires sexual consideration from the employee for job benefits, and

17  the hostile work environment claim."  *Antonius v. King Cnty.*, 153 Wash.2d 256,

18  261 (2004).  Plaintiffs have never alleged that Tadema and Howell were engaged

19  in a "quid pro quo" relationship, and there was no evidence presented at trial to

20  even remotely support such a finding.  Accordingly, the Court will assume that

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 25

Plaintiffs are asserting a hostile work environment theory.  There are four elements to a hostile work environment claim under the WLAD: "(1) the *harassment* was unwelcome, (2) the *harassment* was because of sex, (3) the *harassment* affected the terms and conditions of employment, and (4) the *harassment* is imputable to the employer."  *Antonius*, 153 Wash.2d at 261 (emphasis added) (citation omitted).  There was no evidence that Howell ever "harassed" Tadema.  In any event, there was no evidence presented at trial that Howell was Tadema's supervisor, *i.e.*, that he could take any tangible employment action such as hiring, firing, promoting or reassigning.  *See Vance v. Ball State Univ.*, --- U.S. ---, 133 S. Ct. 2434 (2013).  Plaintiff's argument is unpersuasive.

Similarly, Reiber's argument that Fisher put Defendants "on notice" of a sexually hostile work environment—thereby triggering a "duty to investigate" the alleged affair—is completely lacking in evidentiary support.  Viewed in the light most favorable to Reiber, the evidence presented at trial established that Fisher's purpose in calling the October 21, 2008 meeting was to help correct a situation that had begun to make certain firefighters feel "uncomfortable."  Critically, Fisher never so much as *implied* that his colleagues were being subjected to a sexually hostile work environment—or that any type of "investigation" was warranted.  Rather, the evidence established that Fisher merely wanted someone in a position

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 26

1   of authority to inform Tadema and Howell of the *perception* among their co-

2   workers that they were involved in an inappropriate consensual relationship.

3       Fisher's own written synopsis of the October 21, 2008 meeting, introduced

4   on the third day of trial as Plaintiffs' Exhibit No. 11, is particularly instructive:

> Today we had a staff meeting.  After the staff meeting, I spoke with
> Capt. Reiber and Capt. Foster about Chelsea and Andrew always
> being together.  Chelsea and Andrew had been on their shifts, so how
> did they handle it?  They both acknowledged that it felt "uneasy" and
> seemed "weird," but what they did off duty was not concerning unless
> it affected the Department.  During our discussion we noted the public
> as well as other members of the department were starting to make
> comments about "girlfriend," "affair," and "if Andrew's wife
> approved."  **We felt this was starting to affect the Department
> image so we requested a meeting with Chief Heston to discuss it.**
>
> Reiber, Foster and I met with Heston.  We briefed him on the
> suspicious activity between Chelsea and Howell and how it made
> members of the public and department uncomfortable.  I was willing
> to meet with Howell on the topic but wanted advice from Heston on
> how to pursue this topic.  Heston said, "He would speak to Howell
> about it," and he did.

14  ECF No. 83-1 (emphasis added).  As this and other evidence plainly established,

15  Fisher was not "reporting" a violation of department policy or "opposing" a

16  sexually hostile work environment; he simply wanted someone to tell Tadema and

17  Howell to "knock it off."  Reiber's attempts to construe Fisher's statements as a

18  "complaint" about a sexually hostile work environment are wholly unsupported by

19  the evidence.

20

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 27

1    Moreover, even assuming for the sake of argument that Fisher's statements

2    could somehow be construed as a sexually hostile work environment complaint, it

3    is undisputed that they were not investigated as such.  By Reiber's and Fisher's

4    own accounts, the October 21, 2008 meeting ended with the senior command staff

5    agreeing to alert Howell to his co-workers' "discomfort" and counseling Tadema

6    on how to be a better "team player" in the firehouse.  Tellingly, Reiber describes

7    this approach in his briefing as "*low-key managerial conferral and counseling*."[7]

8    ECF No. 187 at 17 (emphasis added).

9    Contrary to Reiber's assertions, engaging in "low-key managerial conferral

10   and counseling" plainly does not amount to assisting in a "proceeding" under the

11   WLAD.  Although Reiber now claims that Fisher's allegations should have been

12   investigated, the uncontested evidence was that they were not.  Both he and Fisher

13   clearly understood that the situation would be handled informally.  Reiber's

14   attempts to construe his counseling of Tadema as "a proceeding cognizable under

15

16   _____

     [7] During the hearing on the instant motion, Reiber conceded that this "counseling"

17   was not presented to Tadema as a means of correcting perceptions that she was

18   involved in an inappropriate relationship.  This concession is consistent with the

19   evidence adduced at trial, which established that Reiber never discussed the

20   alleged affair with Tadema—at all—while she was under his command.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 28

1    [the WLAD]" are tortured and unpersuasive.  *See* ECF No. 187 at 7.  At bottom,

2    there was simply no evidence presented from which a rational jury could conclude

3    that Reiber's attendance at the October 21, 2008 meeting or his subsequent efforts

4    to counsel Tadema amounted to protected "participation" activity.[8]

5        Finally, Reiber is not entitled to protected status by virtue of having

6    "opposed" the alleged affair while defending himself against Tadema's hostile

7    work environment complaint.  *See* ECF No. 187 at 16-20.  Reiber cites to

8    *Hollenback v. Shriners Hosp. for Children*, 149 Wash. App. 810 (2009) for the

9    proposition that reporting an affair which has a detrimental effect on the workplace

10   has been "recognized" as protected opposition activity under the WLAD.  ECF No.

11   187 at 20.  Although *Hollenback* involved a complaint about a relationship

12   between co-workers having a negative impact on the workplace, the case did not

13   "recognize" the plaintiff's complaint as protected activity.  149 Wash. App. at 816-

---

14   [8] Reiber's retaliation claim also encompassed the second investigation conducted

15   by Beth Kennar after Turpin and Howell lodged formal retaliation complaints.

16   Although Reiber was not disciplined at the conclusion of this investigation, he

17   asserts that the investigation itself was retaliatory.  For the reasons discussed below

18   in response to a similar argument raised by the other Plaintiffs, the Court rejects

19   this argument.

20

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 29

17.  As Defendants correctly note, the court held that the employer had conceded the issue of protected activity in the trial court and thereby waived its right to contest the issue on appeal.  *See Hollenback*, 149 Wash. App. at 822 ("Based on its concession, Shriners waived the right to contest the issue of statutorily protected activity.").  Thus, *Hollenback* does not support Reiber's position.  In view of the foregoing, the Court concludes that Reiber failed to establish a prima facie case as to the protected activity element of his WLAD retaliation claim.

> b.  *Causation*

Defendants further contend that Reiber failed to prove the third element of his WLAD retaliation claim: that his protected activity was a substantial factor in Defendants' decision to take adverse employment action against him.  The Court agrees.  Having painstakingly scoured the record, the Court has found no evidence—*none*—to support a finding that Reiber's attendance at the meeting in Heston's office and/or his subsequent counseling of Tadema prompted Defendants to discipline him for creating a hostile work environment.

Throughout these proceedings, Reiber and his co-Plaintiffs have maintained that Chief Wilkins, Karen Sires and John Sherman maliciously conspired to derail Reiber's career.  The allegations to this effect have been quite extraordinary:

- Captain Eric Reiber of the Pullman Fire Department seeks relief against the City of Pullman, Washington, and its officials for pursuing charges of egregious, sexually-offensive conduct against him which the officials knew from the start to be intentional

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 30

falsehoods based on conjured evidence.  Pls.' Am. Compl., ECF No. 2, at ¶ 1.

- The whole investigation was set in motion with an enormously-injurious lie by James Turpin, and the lie was embraced and pursued with a vengeance by defendants because they were intent on taking Reiber down with it.  Pls.' Opp'n to Defs.' Mot. for Partial Summ. J., ECF No. 85, at 11.

- [A] fact finder could reasonably find that the allegations against Reiber of gross sexual impropriety were knowingly and deliberately false.  Wilkins and Sires knew that Turpin's charges were false, yet they proceeded in collusion with Turpin based on their malice and ill-will towards Reiber.  Pls.' Mot. for Recons., ECF No. 114, at 7.

- Tadema and Howell, together with their close friend Turpin . . . colluded with receptive City officials Wilkins and Sires to advance insubstantial and false charges as a means of achieving [a] range of individual objectives[.]  Pls.' Opp'n to Defs.' Motion for J. as a Matter of Law, ECF No. 187, at 10.

- City officials served as a willing conduit for Turpin's animus toward Reiber even in the face of clear proof that Turpin's accusations were falsehoods[.]  Pls.' Opp'n to Defs.' Motion for J. as a Matter of Law, ECF No. 187, at 11.

- [Tadema and Howell] went to Turpin, and the three of them concocted lies that were knowingly embraced by Chief Wilkins and Sires as a vehicle for denigrating Reiber's popularity, influence and standing in the workplace.  Pls.' Opp'n to Defs.' Motion for J. as a Matter of Law, ECF No. 187, at 14-15.

Unfortunately for Plaintiffs, these allegations were wholly unsupported by the evidence adduced at trial.  Viewed in the light most favorable to Plaintiffs, the evidence established that Tadema accused Reiber of subjecting her to a hostile

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 31

work environment after questions arose about (1) her involvement in a romantic

relationship with Howell; and (2) her competence to serve as a full-time firefighter.

The timing of Tadema's complaint gives rise to an inference that she may have had

an ulterior motive for accusing Reiber of misconduct.  The possibility that Tadema

acted with an ulterior motive, in turn, gives rise to an inference that her allegations

may have been embellished or fabricated.  Thus, the Court agrees with Plaintiffs in

one limited respect: the circumstances surrounding Tadema's complaint warrant

careful scrutiny of her credibility.

The evidence does not, however, support an inference that Defendants *knew*

Tadema had lied and proceeded to investigate and discipline Reiber anyway.  Quite

to the contrary, the evidence indicates that Defendants recognized the seriousness

of Tadema's allegations—and *performed an investigation to determine whether*

*those allegations were true or false.*  In that regard, it cannot be ignored that Reiber

admitted some, if not most, of the conduct for which he was disciplined (albeit

while disclaiming any ill will).  For instance, Reiber admitted: calling members of

the department derogatory and demeaning names (which was apparently quite

common throughout the department), Ex. 55 at 2 (Reiber's Rebuttal dated July 3,

2009); that he may have called Tadema a "scrawny blonde" in front of two-thirds

of the crew, *id.* at 3; that he asked other firefighters' wives how "his" kids were

doing, *id.* at 3; that he made disparaging comments about others, *id.*, at 5-6; that he

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 32

allowed pranking to occur in the station, *id.*, at 6-7; that he teased Tadema about what she ate, *id.* at 14; that he tugged on Tadema's ponytail, *id.* at 15; and that asked other firefighters' wives, "Are you ready to run off with me yet?", *id.*  In short, the evidence presented at trial demonstrated that Tadema's allegations were largely corroborated *by Reiber himself*.  This evidence is blatantly inconsistent with Reiber's assertions that the charges against him were fabricated.

At trial, Reiber and his co-Plaintiffs placed tremendous emphasis on the so-called "naked photo" allegations.  In their view, the fact that Defendants actually investigated these allegations is conclusive proof of a conspiracy.  But for the dogged persistence with which Plaintiffs advanced this theory, it would not be worthy of discussion.  The undisputed evidence, both on summary judgment and at trial, was that Taylor confirmed to Chief Wilkins that a request for naked photos of his wife was "in line with the type of statements" that Reiber had actually made.  *See* Plaintiff's Exhibit 46.  Taylor did not, as Plaintiffs have repeatedly alleged, disavow the statements originally attributed to him by Turpin.  In light of this substantial confirmation, no reasonable jury could find that Defendants' decision to inquire about requests for naked photos during the hostile work environment investigation was evidence of a conspiracy to ruin Reiber's career.

In the final analysis, there was simply no evidence presented from which a rational jury could find that Defendants "colluded" with Tadema, Howell or

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 33

Turpin, or that they investigated Reiber with knowledge that the charges against him were "bogus," "specious," "concocted," "fabricated," or otherwise untrue. With due respect, Reiber's continued assertions to the contrary are singularly incredible in light of the evidence presented at trial. Defendants received a hostile work environment complaint concerning a female probationary firefighter. They investigated it. They determined it had merit. They imposed discipline accordingly. Was the investigation perfect? No. Could Defendants have cast a wider net? Perhaps. Could a reasonable jury have found from the evidence presented that Defendants conspired with Tadema, Howell and Turpin to concoct false charges and impose unjust discipline? Absolutely not.

Moreover, even if Reiber's allegations of collusion *could* be credited, there was no evidence whatsoever linking the alleged collusion to protected activity. As Defendants correctly note, Reiber successfully established that he was not well-liked by Chief Wilkins as a result of, *inter alia*, (1) his union activities; (2) his popularity within the Department; (3) his career ambitions; (4) his misuse of Department equipment; and (5) his comments about Chief Wilkins' advanced age. This evidence apparently persuaded the jury that Chief Wilkins treated Reiber unfairly, as evidenced by the fact that Chief Wilkins was the only individual Defendant found personally liable for his conduct.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 34

What was entirely lacking from Reiber's case was evidence that Chief Wilkins retaliated against him *for any reason related to his involvement in the affair saga*. Had Reiber "reported" the suspected affair to his superiors and asked that corrective action be taken, this could have been a different case. But, by his own account, Reiber was supportive of Tadema during the October 21, 2008 meeting and agreed to help counsel her about how to be a better team player. ECF No. 187 at 17. In the absence of direct evidence to the contrary, it is virtually impossible to imagine how Reiber playing a *supportive* role in this process might have prompted Chief Wilkins to retaliate against him.

When pressed by the Court for evidence of retaliatory motive during the motion hearing, Reiber's counsel suggested that Chief Wilkins may have retaliated against Reiber for "impeding" his efforts to move forward with the investigation. According to counsel, the affair was an "inconvenient truth" which, if revealed, would derail the Defendants' conspiracy. ECF No. 187 at 15. Aside from being completely divorced from the evidence, this argument puts the cart before the horse on the issue of causation; if Chief Wilkins had truly been motivated to retaliate against Reiber for "impeding" the conspiracy, then what prompted him to hatch the conspiracy in the first place? This failure of logic is but one example of the many deficiencies in Reiber's theory of causation.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 35

In sum, the evidence simply cannot support a finding that Chief Wilkins retaliated against Reiber for attending the October 21, 2008 meeting and/or for his subsequent counseling of Tadema.  While the evidence was arguably sufficient to support a finding that Chief Wilkins retaliated against Reiber for *other* reasons, it was insufficient to prove that he did so for any reason prohibited by the WLAD.  The jury's finding to the contrary was not a reasonable interpretation of the evidence.  On the issue of causation, the evidence "permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."  *Pavao*, 307 F.3d at 918.  Accordingly, Defendants are entitled to judgment as a matter of law on Reiber's WLAD retaliation claim.

2.  Plaintiffs Fisher, Volk, Gollnick, Wilkins and Wehrung

The theory of retaliation asserted by Plaintiffs Fisher, Volk, Gollnick, Wilkins and Wehrung is relatively straightforward.  These Plaintiffs maintain that they were retaliated against for submitting written statements critical of Tadema, Turpin, Howell and Taylor in conjunction with Reiber's pre-disciplinary *Loudermill* hearing on June 24, 2009 (the so-called "*Loudermill* statements").  They assert that these statements constitute protected activity under both the

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 36

1    WLAD and Title VII, and that, as a result, they should not have been disciplined

2    (or even investigated) for anything contained therein.[9]

3            *a.  Protected Activity*

4            Defendants contend that the *Loudermill* statements do not amount to

5    protected activity for two reasons.  First, they argue that objecting to what one

6    perceives to be a corrupt investigation is not protected activity as a matter of law.

7    In the alternative, they assert that Plaintiffs lost any protection to which they were

8    otherwise entitled by deliberately retaliating against Tadema, Howell, Turpin and

9    Taylor in their *Loudermill* statements.

10           The Court is not persuaded that objecting to perceived corruption during an

11   internal investigation can never amount to protected activity.  Defendants have not

12   cited any authority to support this proposition, and the Court has been unable to

13   locate any published cases directly on point.  However, the Supreme Court's recent

14   decision in *Crawford* is instructive.  There, the Court held that an employee who

15   provided examples of harassment by her supervisor in conjunction with an

16

17   [9] Unlike Reiber, these Plaintiffs have not drawn any meaningful distinctions

18   between "participation" and "opposition" activity.  For the reasons discussed above

19   in conjunction with Reiber's claim, Defendants are entitled to judgment as a matter

20   of law on any theories based upon "participation" in the internal investigations.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 37

investigation into a complaint lodged by a different employee was engaged in

protected activity. *Crawford*, 555 U.S. at 276.  Although the employee had not

initiated the investigation or actively protested the harassing conduct, the Court

reasoned, her statements were still protected "opposition" activity:

> There is . . . no reason to doubt that a person can "oppose" by
> responding to someone else's question just as surely as by provoking
> the discussion, and nothing in the statute requires a freakish rule
> protecting an employee who reports discrimination on her own
> initiative but not one who reports the same discrimination in the same
> words when her boss asks her a question.

*Id.* at 277-78.

While the facts of *Crawford* are distinguishable from the instant case, the

Court's reasoning is persuasive.  An employee who comes forward with

information relevant to an internal investigation should be protected from

retaliation, regardless of whether he or she was the original complainant.  If the

employee believes that the employer has overlooked or ignored relevant evidence,

he or she should be permitted to say so without fear of reprisal.  Accordingly, to

whatever extent the Plaintiffs' *Loudermill* statements can be construed as

objections to deficiencies in the Defendants' investigation, the Court concludes

that they are protected opposition activity.

Defendants' alternative argument is more persuasive.  The evidence

presented at trial established that Plaintiffs engaged in a deliberate, coordinated

campaign to retaliate against those who had accused Reiber of misconduct.  The

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 38

most obvious evidence of this behavior is the Plaintiffs' *Loudermill* statements themselves. These statements contain what can only be described as salacious allegations against Tadema, Turpin, Howell and Taylor—the very same firefighters who had complained about Reiber subjecting subordinates to a hostile work environment. While certain of these allegations could be construed as legitimate rebuttals, others serve no purpose other than to attack the character and reputations of the complaining witnesses. Indeed, the *Loudermill* statements expressly invoke the "poor character" of Tadema, Howell, Turpin and Taylor as a basis for dismissing their allegations. A portion of Fisher's *Loudermill* statement is particularly instructive:

> Please consider the following facts **about the character** of the complaining witnesses:
>
> Chelsea Tadema is not all that timid and fragile, considering she's apparently been engaged in an open affair for several years under the nose of [Howell's] wife, while serving as the caregiver of their children. She's even slept in the same room with him on duty. She apparently sees nothing oppressive or threatening in this relationship, only in Captain Reiber's discussion of her performance with her.
>
> The man she's apparently having the affair with is coarse, uncouth and obsessed with sexual matters, and talks about intercourse all the time with everyone in the workplace. He flaunts a swinging lifestyle and his interest in "S & M" sex, and expects everyone to tolerate it regardless of how uncomfortable they are. He brings hard-core pornography, some dealing with bestiality, into the station until other members ask him to please stop. We don't hear Tadema say that she feels offended or victimized by any of this behavior.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 39

The man she's apparently having the affair with is good friends with Lt. Turpin and his wife, who have likewise made it known in the workplace that they're available to "swing." Howell has approached new firefighters with an open invitation to join them, presumably with the Turpins' permission.

Howell has treated at least one fire fighter's wife in an incredibly disrespectful manner at the station, asking if she shaves her pubic area, and approached their son with crude questions about his sex life. He has demonstrated the same disrespect for his own wife by constantly describing to co-workers their favorite sexual positions. He asks for intimate details of other fire fighters' relationships, and makes coarse observations about their partners. Taylor takes part in this. Again, we don't hear Tadema say that she feels offended or victimized by any of this.

Howell has on several occasions urged me to shave my genitals as well as my wife's, offering to explain how it enhances sexual pleasure. He has not been deterred by my telling him, "I'm not going to do that (shave)." He's either oblivious to the discomfort that he causes people when he talks about such things, or does it intentionally to cause embarrassment.

Mark Sugden, who works the same shift as Lt. Turpin and Howell, says that Howell once "tea-bagged" him when Sudgen was slow to wake up. This involved Howell dragging his scrotum over Sudgen's forehead as he lay in bed. Lt. Turpin confronted me June 26th, 2009, after I approached Sugden to confirm this. Turpin minimized the incident—said that Howell had his boxer shorts on when he did it, as though that rendered it no big deal. Turpin said he had dealt with the situation. It begs the question whether he did deal with it appropriately or just covered up a friend's inappropriate behavior.

I recently learned that Turpin and his wife have bragged about having sex at home on duty while a firefighter waited outside in an ambulance. It is not uncommon for the duty crews to run home and get food items or other misc. things that they forgot to bring to work. It personally infuriates me now to know that I may have been taken advantage of because I have waited in an ambulance outside his Dal Street house under false pretenses.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 40

> Lt. Turpin's wife, Lisa, has on many occasions appeared at Department social events, become inebriated, and displayed a tattoo of a lily in her pubic region.  Lisa has also volunteered to many fire fighters that she has had her pubic hair removed by laser, and that the lasering has distorted her tattoo.  Turpin and his wife have otherwise clearly invited sexual conversations and sexual interaction with fire fighters under his command.

> This certainly calls into question how or why any of these people could possibly have been offended by anything Captain Reiber has ever said.

> Needless to say, the conduct of these people constitutes their creation of a sexually hostile work environment for the rest of us.

ECF No. 38-10 at 23-24 (Plaintiffs' Trial Exhibit No. 55) (emphasis added).

This type of blatant character assassination is plainly not the type of "opposition" activity that Title VII and the WLAD were designed to protect.  As Judge Posner of the Seventh Circuit Court of Appeals recently explained in an analogous context, an employer's investigation of a discrimination complaint does not open the floodgates to malicious and defamatory accusations:

> An employer is forbidden to discriminate against an employee who participates in an investigation of employment discrimination.  But participation doesn't insulate an employee from being discharged for conduct that, if it occurred outside an investigation, would warrant termination.  This includes making frivolous accusations, or accusations grounded in prejudice.  For it cannot be true that a plaintiff can file false charges, lie to an investigator, and possibly defame co-employees, without suffering repercussions simply because the investigation was about sexual harassment.  To do so would leave employers with no ability to fire employees for defaming other employees or the employer through their complaint when the allegations are without any basis in fact. . . . Title VII was not

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 41

designed to arm employees with a tactical coercive weapon under which employees can make baseless claims simply to advance their own retaliatory motives and strategies. Were we to adopt a different standard, an employee could immunize his unreasonable and malicious internal complaints simply by filing a discrimination complaint[.]

*Hatmaker*, 619 F.3d at 745 (internal quotations and citations omitted); *see also*

*Hubbell v. World Kitchen, LLC*, 688 F. Supp. 2d 401, 440-441 (W.D. Pa. 2010)

(Title VII's opposition clause "does not prevent an employer from imposing

discipline on an employee who, while 'opposing' an 'unlawful employment

practice,' takes it upon himself or herself to defame other employees"); *Glover v.*

*S. Carolina Law Enforcement Div.*, 170 F.3d 411, 416 (Williams, J., dissenting) (in

enacting Title VII, "Congress surely did not intend to give asylum to employees to

gratuitously disparage and maliciously accuse their peers of professional

misconduct having nothing whatsoever to do with the underlying charge of

discrimination").

　　　　As these authorities make clear, Title VII and the WLAD may not be used as

a license to attack the character and reputation of those who have come forward to

report workplace discrimination. That is precisely what Plaintiffs have attempted

to do here. Thus, the Court concludes that those portions of the Plaintiffs'

*Loudermill* statements which prompted Defendants to initiate a retaliation

investigation do not amount to protected opposition activity.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 42

1          b. *Causation*

2          Defendants further maintain that they are entitled to judgment as a matter of

3     law on the causation element of the remaining Plaintiffs' retaliation claims.  In

4     support of this assertion, Defendants argue that they were legally required to

5     investigate Turpin's and Howell's retaliation complaints.  In their view, this legal

6     obligation to investigate precludes a finding that the investigation was driven by

7     unlawful retaliatory animus.

8          Plaintiffs, for their part, insist that no formal investigation was required.

9     They contend that Defendants should have simply disregarded the retaliation

10    complaints, declined to open an investigation, and declared the matter closed:

11         The [retaliation] investigation was not a required official response to
          Turpin's and Howell's charges of retaliation.  Wilkins and Sires had
12        good cause to know Turpin and Howell had initially proceeded
          against Reiber in bad faith, and that all plaintiffs could claim a
13        legitimate, good faith basis for standing up in opposition to their
          accusations.  **Wilkins and Sires could simply have decided not to**
14        **act, announced the end of these matters and sent everyone back to**
          **work.**  They elected instead to oppress and punish the plaintiffs for
15        their participation and opposition, and that constituted retaliation.

16    ECF No. 187 at 24 (emphasis added).

17         Defendants have the better of the argument.  Although it does not appear

18    that Defendants were legally *required* to investigate Turpin's and Howell's

19

20

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 43

retaliation complaints,[10] they were entirely justified in doing so under the

circumstances.  The Plaintiffs' *Loudermill* statements accuse Tadema, Howell,

Turpin and Taylor of serious workplace misconduct.  Upon being presented with

these allegations, Defendants launched an investigation to determine whether they

could be substantiated.  Defendants concluded that a handful of the more minor

allegations were true (*e.g.*, inappropriate comments made by Howell), while most

of the more serious allegations were not.  ECF No. 38-3 (Defendants' Ex. 563,

admitted 3/28/13).

Plaintiffs have all but ignored the outcome of this investigation.  Given that

many of the more serious allegations against Tadema, Howell, Turpin and Taylor

could not be substantiated—and that Sires found reason to question whether the

---

[10] The Court has found no authority to support such a finding, and Defendants have

not offered any.  Title VII and the WLAD confer jurisdiction to investigate claims

of unlawful discrimination upon the Equal Employment Opportunity Commission

and the Washington State Human Rights Commission, respectively.  *See* 42 U.S.C.

§ 2000e-5; RCW 49.60.230, .240.  Neither statute appears to impose an affirmative

legal obligation on the part of an employer to investigate complaints internally.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 44

allegations had been brought in good faith[11]—Defendants would have been

justified in investigating the Plaintiffs for unlawful retaliation on their own

initiative. *See Total Sys. Servs.*, 221 F.3d at 1176 ("When an employer is told of

improper conduct at its workplace, the employer can lawfully ask: is the accusation

true?").

Nevertheless, the evidence established that Defendants would not have

investigated Plaintiffs for retaliation had Howell and Turpin not lodged formal

complaints with Chief Wilkins.  Upon receiving these complaints, Defendants

_____

[11] In her summary of the investigation Defendant Sires expressed concern about the source and legitimacy of the allegations:

> I am somewhat concerned that the accusations from so many of the [*Loudermill*] statements are identical and according to Mr. Reiber, the statements were written by the Association representative Patricia Urquhardt [sic].  Since Ms. Urquhardt does not work for the City and has not worked with any of the employees involved, and the statements are identical in many instances, it is cause for concern as to who provided the basis for the material.

> \*   \*   \*

> [Howell] has confirmed some of the allegations made against him as I have summarized above.  He has acknowledged some misbehavior, but I am not comfortable with many of the allegations as they are prefaced with supposition and conjecture on what someone feels might have happened.  There are no facts or real witnesses to many of the allegations.

ECF No. 38-13 at 9.

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW ~ 45

were entitled to investigate them as a matter of law.  As the Supreme Court explained in *Crawford*, Title VII gives employers a strong incentive to investigate and eradicate workplace discrimination committed by supervisors in order to avoid vicarious liability.  *Crawford*, 555 U.S. at 278 (noting that employers are "subject to a strong inducement to ferret out and put a stop to any discriminatory activity in their operations as a way to break the circuit of imputed liability" under *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. Boca Raton*, 524 U.S. 775 (1998)).  Ignoring these complaints could easily have exposed Defendants to vicarious liability for failing to prevent and promptly correct retaliation alleged to have been committed by a supervisor.  *See Ellerth*, 524 U.S. at 765.  In light of the seriousness of the allegedly retaliatory accusations, as well as the clear escalation in hostilities between the two groups, Defendants were entitled to take reasonable steps to protect their own financial interests.  Thus, Defendants are entitled to judgment as a matter of law on the causation element of the Plaintiffs' claims.

## B. Plaintiffs' Motion for Attorney's Fees

In view of the foregoing rulings, Plaintiffs' motion for attorney's fees is denied as moot.

///

///

///

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 46

**IT IS HEREBY ORDERED:**

    1.  Defendants' Renewed Motion for Judgment as a Matter of Law (ECF No. 183) is **GRANTED**.

    2.  Plaintiffs' Motion for Attorney's Fees (ECF No. 167) is **DENIED** as moot.

    3.  The Judgment entered April 3, 2013, ECF No. 165, is **VACATED.**

    The District Court Executive is hereby directed to enter this Order, provide copies to counsel, and enter an **AMENDED JUDGMENT in favor of all Defendants**.

    **DATED** August 1, 2013.



THOMAS O. RICE
United States District Judge

ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ~ 47